UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NEONA MODOC, et al.,

                Plaintiff,

    v.

WEST COAST VINYL, INC., et al.,

                Defendant.

CASE NO. 3:10-cv-05007-RJB

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

     This matter comes before the court on Defendants' Motion for Summary Judgment.  Dkt.
30.  The court has considered the pleadings filed in support of and in opposition to the motion
and the file herein.

PROCEDURAL HISTORY

     On December 2, 2009, plaintiffs Neona Modoc, a Caucasian woman; Karon Cowger, a
Caucasian woman; Tori Stevens, an African American woman; Frank Walker, an African
American man; and Tony Lambert, a Caucasian man; filed a civil complaint in Pierce County
Superior Court against West Coast Vinyl, Inc. ("WCV"), Jim Keirstead, and Jamie Keirstead.

1   Dkt. 1, at 18-29.  The complaint alleges that (1) defendants discriminated against all plaintiffs, in

2   violation of the Washington Law Against Discrimination, RCW 49.60.180 and RCW 49.60.210;

3   (2) West Coast Vinyl discriminated against Ms. Modoc, Ms. Cowger, and Ms. Stevens, in

4   violation of Title VII, 42 U.S.C. § 2000(e-2) and (e-3); (3) defendants discriminated against all

5   plaintiffs, in violation of 42 U.S.C. § 1981; and (4) all plaintiffs were wrongfully discharged by

6   defendants.  Dkt. 1.

7           On January 7, 2010, the case was removed to federal court.  Dkt. 1.

8           On February 8, 2011, defendants filed a motion for summary judgment, contending that

9   (1) Ms. Stevens and Ms. Walker's Title VII and WLAD claims are without merit because they

10  cannot demonstrate the WCV replaced them with individuals outside of their protected class,

11  they were terminated for legitimate business reasons, and they cannot establish pretext; (2) Ms.

12  Modoc and Ms. Cowger's claims for retaliation under Title VII and the WLAD are without merit

13  because they did not engage in protected activities, and because they did not suffer adverse

14  employment actions; (3) Mr. Walker cannot state a claim under the WLAD because he has not

15  shown that he engaged in any protected activity or that there was any causal connection between

16  a protected activity and his termination; (4) Mr. Lambert cannot state a claim under the WLAD

17  because he cannot show a causal connection between the alleged protected activity and his

18  termination; (5) because plaintiffs do not have a claim under Title VII or the WLAD, their claim

19  under 42 U.S.C. § 1981 also fails; and (6) plaintiffs' wrongful discharge claims are precluded

20  because they are covered under the WLAD.  Dkt. 30.

21                                    RELEVANT FACTS

22          **West Coast Vinyl.**  WCV is owned and operated by James (Jim) Keirstead and his son,

23  Jamie Keirstead.  WCV manufactures and sells residential vinyl windows and siding and

24

1  provides installation services for those products.  The company maintains sales offices in Seattle

2  and Tacoma, Washington, and Portland, Oregon.  The company's manufacturing plant and

3  corporate headquarters are located in Tacoma, Washington.  Because success in the residential

4  window and vinyl siding industry depends in large part on the performance of its sales and

5  marketing employees, the company terminates employees who fail to perform.

6      **Neona Modoc.**  WCV hired Neona Modoc in April 2006 as a manager in its marketing

7  department.  Ms. Modoc had authority to hire and fire employees.  During the course of her

8  employment, Ms. Modoc hired, disciplined and terminated many employees.  In addition, she

9  authorized promotion and compensation increases for other employees, including Mr. Walker,

10  Ms. Stevens, and Ms. Cowger.

11      In the complaint, Ms. Modoc alleges that she disagreed with the Keirsteads' decisions to

12  terminate various African American employees working in the marketing department and the

13  Seattle sales office because she believed these decisions were racially motivated.  While Ms.

14  Modoc testified in her deposition that she disagreed with the decisions to terminate three

15  employees in the marketing department because they were good performers, there is no evidence

16  that Ms. Modoc expressed concern to defendants that the employees at issue were being

17  terminated because of their race.

18      Ms. Modoc alleges that the Keirsteads told her to fire three African American marketing

19  employees: Stan Douglas, J.J. Moore, and Tori Stevens.  Dkt. 31-1, at 41.  Ms. Modoc stated that

20  she opposed the decision to fire these employees. Dkt. 31-1, at 41.  Ms. Modoc testified that Jim

21  Keirstead told her that two of these employees (not referring to Ms. Stevens) were being

22  terminated for lack of production.  Dkt. 31-1, at 42.  With regard to Ms. Stevens, Ms. Modoc

23  testified that one of Ms. Stevens' phone calls with a customer was recorded; that Roland

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 3

1    Constantineau, another WCV employee, and Jim Keirstead told her to listen to the call with

2    them; that Ms. Stevens had put the customer on hold while she discussed business on another

3    line; and that Jim Keirstead told Ms. Modoc to "get rid of her" because he did not want

4    customers being put on hold.  Dkt. 31-1, at 26.  Ms. Modoc terminated the three employees.

5        Ms. Modoc testified in her deposition that Jamie Keirstead told her that there were too

6    many black canvassers in the Seattle office.  Dkt. 31-1, at 32.  Ms. Modoc testified that the

7    Keirsteads fired Mr. Lambert (a plaintiff in this action), terminated all of the African Americans

8    in the Seattle office, and "hired another gentleman and then hired all white canvassers."  Dkt. 31-

9    1, at 33.  In 2007 and 2008, an average of 30 percent of WCV's canvassers were African

10   American several months out of the year.  See Dkt. 32, at 2.  When Ms. Modoc resigned in 2008,

11   over 16 percent of WCV's canvassers were African American, and that percentage increased as

12   the year wore on.  Dkt. 32, at 2.

13       Ms. Modoc also alleges that the Keirsteads made racial comments in her presence that

14   she found to be racially offensive and derogatory.  Ms. Modoc testified in her deposition that Jim

15   Keirstead, when looking at a group of canvassers, stated that they looked like "gang bangers," or

16   "gangsters," and needed to be cleaned up.  Dkt. 31-1, at 28 and 29.  Ms. Modoc stated that Jim

17   Keirstead asked her if she was "partial" to black people.  Dkt. 31-1, at 30.  Finally, Ms. Modoc

18   stated that Jamie Keirstead told her that her daughter should work at the home shows because she

19   was "young, white and beautiful."  Dkt. 31-1, at 31.

20       Ms. Modoc did not state that she complained to defendants about their alleged

21   discriminatory statements.  Dkt. 31-1, at 23-28.

22       Ms. Modoc alleges that defendants forced her to leave in March 2008 because the

23   workplace became intolerable.  Ms. Modoc testified in her deposition that she left a meeting with

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 4

WCV's owners and managers on March 17, 2008, and resigned her employment, after Jim Keirstead yelled at her because a report was not done right. Dkt. 31-1, at 44. When he started yelling, she walked out of the meeting. Dkt. 31-1, at 44-46.

**Karon Cowger.** WCV hired Ms. Cowger to work in WCV's marketing department in April of 2006. Ms. Modoc was Ms. Cowger's direct supervisor. Ms. Cowger stated in her deposition that she and Ms. Modoc met with Jim and Jamie Keirstead about re-hiring Mr. Douglas, Mr. Moore, and Ms. Stevens after they had been terminated. Dkt. 31-2, at 25-26. Ms. Cowger testified that the issue of race never came up during the discussion. Dkt. 31-2, at 23 and 42. Ms. Cowger left WCV on the same day that Ms. Modoc left. Ms. Cowger testified that defendants did not terminate her employment, that she did not believe that her job was in jeopardy, and that she left WCV voluntarily. Dkt. 31-2, at 12.

Ms. Cowger stated that she was present at several meetings when racially derogatory comments were made. Dkt. 31-2, at 13. She stated that, at one management meeting, the discussion was "about whether the canvassers should be black or white because white people in some neighborhoods don't open their doors to black people." Dkt. 31-2, at 13. Ms. Cowger alleges that by early March, 2008, WCV fired many African American canvassers based upon their race. Dkt. 31-2, at 13-19. However, Ms. Cowger stated that she did not know of any specific canvassers who were discharged for that reason, nor was she told her that any canvassers were let go because of race. Dkt. 31-2, at 13-29. Ms. Cowger believed that African American canvassers were being discriminated against when they were terminated. She did not complain of racism to the Keirsteads. Dkt. 31-2, at 22-28.

**Tori Stevens.** WCV hired Ms. Stevens in June 2006 to work in the marketing department. Ms. Stevens was terminated on November 27, 2007. During the time that she was

employed at WCV, Ms. Stevens never met Jim Keirstead, and only met Jamie Keirstead on one occasion.  Ms. Stevens testified in her deposition that she did not recall hearing any comments from anyone at WCV that she believed were discriminatory.  Dkt. 31-3, at 14.  Ms. Stevens was fired by Ms. Modoc, who told her that Jim Keirstead told her to fire Ms. Stevens because she had kept a customer on hold too long.  Dkt. 31-3, at 9-10.  Ms. Stevens further testified as follows:

> A.  Why?  And I mean I got really upset about it.  And she just explained to me that they had me on recording of holding a customer too long which that customer that I kept on hold too long, I went back on the phone and I set that appointment, but I was doing several different other things too at the same time.
>
> Q.  Did you share that with Neona during this meeting?
>
> A.  Yes.  And I also asked her, I was like, Why would he want to fire me because I'm the top producer and I brought in the most money for this company?  It doesn't make any sense.  And she's like, It doesn't make any sense to me, but she's like, This comes from him directly.  She's like, I have no say in it.
>
> Q.  Did–was anything else said during that meeting that you can recall?
>
> A.  I said that it–for them to record a conversation, something they've never done before, why–I said they–it's because–I made the comment that he was a racist bastard.
>
> Q.  What did Neona say when you said that?
>
> A.  She agreed with me.  Dkt. 31-3, at 10-11.

After Ms. Stevens was terminated, her duties were assigned to Mr. Walker, who is African American.  On January 2, 2008, WCV filled the vacancy created by Ms. Stevens' discharge by hiring another African American.

**Frank Walker.**  WCV hired Frank Walker, an African American, in February 2007 to work as a canvasser in Tacoma, Washington.  Canvassers work in teams and conduct door-to-door marking, visiting potential customers' homes and introducing them to WCV's products.

1  Canvassers generate leads for West Coast Vinyl's marketing staff who then follow-up with

2  interested homeowners and schedule sales appointments.

3         On March 12, 2007, Mr. Walker received a promotion to the position of Training

4  Manager at the Seattle, Washington location.  About that time, Mr. Walker alleges that Jim and

5  Jamie Keirstead asked him to take a more active role in hiring canvassers.  Mr. Walker was later

6  promoted to Acting Canvassing Manager at the Seattle location, replacing Mr. Lambert, a

7  plaintiff in this case.

8         On May 29, 2007, WCV terminated Mr. Walker.  Neither Jim nor Jamie Keirstead could

9  recall the reason for his discharge.  Dkt. 31-6, at 26; Dkt. 31-7, at 20.  Mr. Walker received two

10  notices from WCV regarding his termination:  the first lists "?" as the reason for his termination,

11  and the second lists "lack of performance."  Tony Niemeyer, general manager at WCV, testified

12  that Jim Keirstead asked him to discharge Mr. Walker.  Dkt. 31-10, at 5.  Mr. Niemeyer stated

13  that Jim Keirstead did not tell him why he wanted Mr. Walker terminated "[o]ther than that he

14  just didn't want him there anymore."  Dkt. 31-10, at 5.  Mr. Niemeyer stated that he believed that

15  the reason Jim Keirstead did not want Mr. Walker there anymore was "[t]oo much personal

16  relationship" between Ms. Modoc and Mr. Walker.  Dkt. 31-10, at 5.  Mr. Niemeyer stated that

17  Jim Keirstead had concerns about Mr. Walker's relationship with Ms. Modoc (Mr. Walker's

18  significant other), given the interaction and control between marketing and canvassing activities.

19  Dkt. 31-10, at 6.  Mr. Niemeyer stated that Jim Keirstead did not discuss Mr. Walker's race with

20  Mr. Niemeyer.  Dkt. 31-10, at 6.

21         Mr. Walker stated that he went into Mr. Niemeyer's office and asked him for some

22  advice on how Mr. Walker could make his canvassing better.  Dkt. 31-4, at 22.  Mr. Walker

23  stated that Mr. Niemeyer told him that he (Mr. Walker) needed to diversify his canvassing crew

24

and hire more white people because homeowners are more apt to open their doors to somebody "non-black." Dkt. 31-4, at 20-23. Mr. Walker stated that he told Mr. Niemeyer that the people applying for the job were primarily "black people, Spanish people, what have you." Dkt. 31-4, at 24. There is no evidence that Mr. Walker complained to anyone at WCV about Mr. Niemeyer's alleged discriminatory comments. With the exception of Mr. Niemeyer's comment regarding diversifying the canvassers, Mr. Walker stated that he did not hear any other discriminatory comments or witness any discriminatory conduct from anyone at WCV. Dkt. 31-4, at 26-27.

Mr. Walker stated in his deposition that he believed that he "was discharged from West Coast Vinyl due to my ethnicity." Dkt. 31-4, at 18. Mr. Walker stated that, during his tenure in the Seattle office, "they produced more revenue than they ever have". Dkt 31-4, at 19. Mr. Walker stated that he had no disciplinary history with the company. Dkt. 31-4, at 19.

Mr. Walker was replaced by a person who is a Pacific Islander. Dkt. 32, at 3.

**Tony Lambert.** Mr. Lambert, a Caucasian male, was hired by WCV to work as a canvasser in Tacoma, Washington. Mr. Lambert was promoted to Van Manager, and then to Canvassing Manager. Mr. Lambert alleges that on May 1, 2007, the Keirsteads told him to stop hiring black canvassers, and to terminate half of his black employees and replace them with white employees. Dkt. 31-5, at 10-12. Mr. Lambert testified that he explained to the Keirsteads "how we do our hiring up there, and explained to them that I would not terminate employees that are working and making the company money." Dkt. 31-5, at 10. Mr. Lambert stated that he told the Keirsteads that, "I hire those that apply, and I keep those that perform, and terminate those that do not." Dkt. 31-5, at 15. Mr. Lambert stated that Jamie Keirstead told him that "they would get back with me." Dkt. 31-5, at 15. Mr. Lambert testified that, other than this

1  conversation with the Keirsteads, he could not identify other comments regarding race; although

2  he stated that there were some inappropriate racial comments, he could not recall specifics.  Dkt.

3  31-5, at 16-17.

4        Richard Heine, a regional canvassing manager at WCV, met with some employees in

5  Seattle about allegations that Mr. Lambert was being unprofessional or discourteous.  Dkt. 31-8.

6  Mr. Heine discussed the matter with Mr. Niemeyer, and they agreed that Mr. Lambert should be

7  discharged because of his conduct.  Dkt. 3108, at 5.  Mr. Heine stated that he spoke to Jamie

8  Keirstead about the matter and was told to terminate Mr. Lambert.  Dkt. 31-8, at 4.  On May 10,

9  2007, Mr. Heine and Mr. Niemeyer terminated Mr. Lambert for "lack of professionalism."  Dkt.

10 31-17, at 2.  Mr. Lambert stated that he was told that Jim and Jamie Keirstead had told Mr. Heine

11 and Mr. Niemeyer to discharge him because of a complaint of discrimination that had been made

12 against him, but Mr. Heine and Mr. Niemeyer would not tell him who had made the complaint.

13 Dkt. 31-5, at 8.

14        After Mr. Lambert was terminated, WCV assigned his duties to Mr. Walker, as interim

15 manager.  Dkt. 31-4, at 10.

16                          SUMMARY JUDGMENT STANDARD

17        Summary judgment is proper only if the pleadings, the discovery and disclosure materials

18 on file, and any affidavits show that there is no genuine issue as to any material fact and that the

19 movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

20 entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

21 showing on an essential element of a claim in the case on which the nonmoving party has the

22 burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

23 of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

24

1  for the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

2  (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

3  metaphysical doubt."); *see also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

4  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

5  requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

6  *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

7  *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

8          The determination of the existence of a material fact is often a close question.  The court

9  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

10 e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elect.*

11 *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

12 of the nonmoving party only when the facts specifically attested by that party contradict facts

13 specifically attested by the moving party.  The nonmoving party may not merely state that it will

14 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

15 to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

16 Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

17 be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

18         The Ninth Circuit has provided additional guidance when an employer brings a motion

19 for summary judgment in an employment discrimination case.  Such motions must be carefully

20 examined in order to zealously guard an employee's right to a full trial, since discrimination

21 claims are frequently difficult to prove without a full airing of the evidence and an opportunity to

22 evaluate the credibility of the witnesses.  *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112

23 (9th Cir. 2004).  This high standard means that an employee need only produce "very little

24

1  evidence" to survive summary judgment in a discrimination case because the ultimate question is

2  one that can only be resolved through a "searching inquiry" – one that is most appropriately

3  conducted by the fact-finder, upon a full record. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d

4  1406, 1410 (9th Cir. 1996) (internal quotations omitted).

5  APPLICABLE LEGAL STANDARDS

6  **1.  Claims under Title VII and WLAD (RCW 49.60)**

7          Under Title VII of the Civil Rights Act of 1964, it is unlawful "for an employer– (1) to

8  fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

9  individual with respect to his compensation, terms, conditions, or privileges of employment,

10  because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §2000e-

11  2(a)(1).  Disparate treatment claims brought under either Title VII or RCW 49.60 are analyzed

12  under the *McDonnell-Douglas* burden shifting framework.  C*oghlan v. American Seafoods Co.*

13  *LLC.*, 413 F.3d 1090, 1093-94 (9th Cir. 2005); *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 181

14  (2001).

15          In order to prevail on a Title VII or WLAD claim of discrimination, a plaintiff must first

16  establish a prima facie case of discrimination consisting of the following elements: (1) plaintiff

17  belongs to a protected class; (2) he or she was performing his job according to the employer's

18  legitimate expectations; (3) he or she suffered an adverse employment action; and (4) other

19  employees with qualifications similar to his or her own were treated more favorably.  *McDonnell*

20  *Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vasquez v. County of Los Angeles*, 307 F.3d

21  884, n. 5 (9th Cir. 2002).  If the plaintiff establishes a prima facie case, the burden then shifts to

22  the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment

23  decisions. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802.  Once the defendant satisfies

24

1   this burden, the plaintiff must demonstrate that the employer's alleged reason for the adverse

2   employment decision is a pretext for a discriminatory motive.  *Id.* at 804.

3          To establish a retaliation claim under Title VII, "a plaintiff must show (1) involvement in

4   a protected activity, (2) an adverse employment action and (3) a causal link between the two."

5   *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (citing *Payne v. Norwest Corp.*,

6   113 F.3d 1079 (9th Cir.1997)).  At that point, "the burden of production shifts to the employer to

7   present legitimate reasons for the adverse employment action.  Once the employer carries this

8   burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason

9   advanced by the employer was a pretext.  Only then does the case proceed beyond the summary

10  judgment stage."  *Id.*  Temporal proximity between protected activity and an adverse

11  employment action can constitute sufficient circumstantial evidence of retaliation in some cases.

12  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1069 (9th Cir. 2003) (citing *Bell v. Clackamas*

13  *County*, 341 F.3d 858, 865 (9th Cir. 2003).

14      **2.  Claims under 42 U.S.C. § 1981**

15         Under 42 U.S.C. § 1981(a) upon all persons are conferred the right "to make and enforce

16  contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and

17  proceedings[.]"  Section 1981(a) further provides that "all persons shall be subject to like

18  punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  In a

19  § 1981 action, plaintiffs must show intentional discrimination on account of race.  *Evans v.*

20  *McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989).  In order to establish a prima facie case under §

21  1981, plaintiffs must prove: (1) that they are members of a racial minority; (2) that the

22  defendants had an intent to discriminate on the basis of race; and (3) that the discrimination

23  concerned one or more activities enumerated in the statute.  *Morris v. Office Max, Inc.*, 89 F.3d

24

411, 413-14 (7th Cir. 1996); *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994).

The element of intentional discrimination in a § 1981 claim is identical to the element of

intentional discrimination in a § 1983 claim.  *Hispanic Taco Vendors of Washington v. City of*

*Pasco*, 790 F. Supp. 1023, 1031 (E.D. Wash. 1991), *affirmed, Hispanic Taco Vendors of*

*Washington v. City of Pasco*, 994 F.2d 676, 679 n. 3. (9th Cir. 1993).

Courts apply the same legal principles as those applicable in a Title VII case when

analyzing an employee's 42 U.S.C. § 1981 claim.  *Fonseca v. Sysco Food Servs. of Ariz., Inc.*,

374 F.3d 840, 850 (9th Cir. 2004); *see also Jurardo v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412

(9th Cir. 1987) ("facts sufficient to give rise to a Title VII claim are also sufficient for a § 1981

claim").  The WLAD, RCW 41.60, follows the same principles as Title VII claims.  *See, e.g.*

*Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wn.2d 675, 678 (1986) ("RCW 49.60 [the

WLAD] is patterned after Title [VIII ... [consequently, decisions interpreting the federal act are

persuasive authority for the construction of RCW 49.60").

### 3.  Constructive Discharge Claims under Federal and State Law

#### *Constructive Discharge under Federal Law*

Title VII encompasses employer liability for constructive discharge.  The Ninth Circuit

has explained that "[w]here a plaintiff fails to demonstrate the severe or pervasive harassment

necessary to support a hostile work environment claim, it will be impossible for her to meet the

higher standard of constructive discharge:  conditions so intolerable that a reasonable person

would leave the job." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).  The

plaintiff must show more than a Title VII violation to prove constructive discharge.  The fact that

the plaintiff may have proven a hostile work environment is not enough by itself to prove

constructive discharge as well.  *See Id.*

1    Harassment based on sex, race, national origin, or religion, can interfere with the terms

2    and conditions of employment and therefore can, when sufficiently severe, cause a constructive

3    discharge in violation of Title VII.  For harassment to be actionable under Title VII, the offensive

4    conduct must be sufficiently severe or pervasive to alter the conditions of the victim's

5    employment and create a hostile working environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

6    21- 22 (1993).  This standard requires that the environment be both objectively and subjectively

7    offensive.  *Id.*  For actionable harassment to exist, the plaintiff must plead and prove that (1) she

8    belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment

9    was based on race; (4) the harassment affected a term, condition, or privilege or employment;

10   and (5) defendant knew or should have know about the harassment and failed to take action.  See

11   e.g., *Moore v. Kuka Welding Sys. & Robot Corp.*, 171 F.3d 1073 (6th Cir. 1999).  Harassment

12   affects a "term, condition, or privilege of employment" if it is sufficiently severe or pervasive to

13   alter the conditions of the plaintiff's employment and creates an abusive working environment.

14   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).  A reasonable person must be able to find the

15   work environment hostile or abusive, and the victim must actually perceive it to be so.  *Id.*

16           ***Constructive Discharge under State Law***

17           Under Washington law, generally, absent a contract requiring cause for termination,

18   employment relationships are at-will by either employer or employee.  *Selix v. Boeing Co.*, 82

19   Wn. App. 736, 740 (1996).  Under the at-will doctrine, an employer can, with limited exceptions,

20   discharge an employee without fear of liability.  *Bakotich v. Swanson*, 91 Wn. App. 311, 314-15

21   (1998)).  One of the narrow exceptions to the at-will rule is for a violation of public policy.

22   *Wilmot v. Kaiser Aluminum and Chem. Corp.*, 118 Wn.2d 46, 53 (1991) (citing *Thompson v. St.*

23   *Regis Paper Co.*, 102 Wn.2d 219, 232 (1984)).

24

1    Washington law recognizes an action for wrongful discharge, which may be either

2  express or constructive.  *Snyder v. Medical Service Corp. of Eastern Washington*, 145 Wn.2d

3  233, 238 (2001) (citing *Riccobono v. Pierce County*, 92 Wash. App. 254, 263, 966 P.2d 327

4  (1998)).  "A claim for wrongful discharge in violation of public policy may arise when an

5  employer discharges an employee for reasons that contravene a clear mandate of public policy."

6  *Korslund v. Dyncorp Tri-Cities Services, Inc.*, 156 Wn.2d 168 (2005) (citing *Gardner v. Loomis*

7  *Armored, Inc.*, 128 Wn.2d 931, 941 (1996)).  The discharge may be either "express" or

8  "constructive."  *Id.*  There are four elements to analyze for a wrongful discharge in violation of

9  public policy claim: (1) the existence of a clear public policy (the clarity element), (2)

10  discouraging the conduct in which plaintiff engaged would jeopardize the public policy (the

11  jeopardy element), (3) the public-policy-linked conduct caused the dismissal (the causation

12  element), and (4) there must not be an overriding justification for the dismissal (the absence of

13  justification element).  *Gardner*, at 941.

14    The plaintiff has the burden of establishing the existence of a clear mandate of public

15  policy.  *Bakotich v. Swanson*, 91 Wn. App. 314-15 (1998)).  The public policy must be judicially

16  or legislatively created.  *Thompson*, 102 Wn.2d at 232.  The public policy exception has

17  generally been recognized in four different situations: where an employee is fired (1) for refusing

18  to commit an illegal act; (2) for performing a public duty or obligation; (3) for exercising a legal

19  right or privilege; and (4) in retaliation for reporting employer misconduct.  *Dicomes v. State*,

20  113 Wn.2d 612, 618 (1989).

21    **4. Wrongful Discharge in Violation of Public Policy Claims**

22    To succeed on a state law claim for wrongful discharge in violation of public policy, a

23  plaintiff must establish four necessary elements:  (a) that a clear public policy exists; (b) that

24

1  discouraging the conduct in which the plaintiff engaged would jeopardize the public policy; (c)

2  that the public-policy-linked conduct caused the dismissal; and (d) that defendants have not

3  presented an overriding justification for the dismissal. *Roberts v. Dudley*, 140 Wn.2d 58, 64-65

4  (2000).

5        While it is clear that the WLAD provides the foundation for a public policy prohibiting

6  adverse employment action for opposing discrimination in the workplace, Washington courts

7  have been cautious when applying the public policy exception to the at-will employment

8  doctrine. *Cooper v. Univ. of Wash.*, 2007 WL 3356809 (W.D.Wash.) *6.  The exception is a

9  narrow one and will generally be applied "only when offensive conduct would otherwise go

10  unredressed." *Id.* (quoting *Blinka v. Wash. State Bar Ass'n*, 109 Wn. App. 575, 586 (2001)).

11  There is no automatic yes or no answer applicable to all cases where the statute setting forth

12  public policy also contains a remedy. *Kaiser Aluminum and Chemical Corp. v. Wash. Fruit and*

13  *Produce*, 118 Wn.2d 46, 54 (1991).  Instead, the answer depends upon the particular statute's

14  language and provisions, and may, under appropriate circumstances, depend in part upon other

15  manifestations of legislative intent. *Id.*  The WLAD precludes tort claims under public policy

16  when the conduct falls within the scope and elements of the WLAD.  *See Cooper*, 2007 WL

17  3356809.  A claim of wrongful discharge in retaliation for opposing discrimination falls within

18  the scope of the WLAD, and in such cases plaintiffs are not "permitted to do an end run around

19  the elements of the statute by asserting a tort claim for the same conduct." *Cooper*, 2007 WL

20  3356809.

21

22

23

24

DISCUSSION

**1.  Neona Modoc and Karon Cowger**

The complaint alleges that defendants discriminated against Ms. Modoc and Ms. Cowger, in violation of Title VII and the WLAD; discriminated against them, in violation of 42 U.S.C. § 1981; and constructively discharged them under Federal and State law.

Defendants contend that Ms. Modoc and Ms. Cowger's claims under Title VII and the WLAD should be dismissed because they did not engage in any protected activities, and because they did not suffer any adverse employment actions.  Defendants maintain that, because there are no viable claims under Title VII or the WLAD, Ms. Modoc and Ms. Cowger's claims under 42 U.S.C. § 1981 should also be dismissed.

Plaintiffs contend that Ms. Modoc and Ms. Cowger engaged in the protected activity of opposing racial comments and policies at WCV.  Plaintiffs further contend that, although Ms. Modoc and Ms. Cowger quit their positions at WCV, they nonetheless suffered adverse employment actions through constructive discharge.

Plaintiffs have not met their summary judgment burden to show that Ms. Modoc and Ms. Cowger were constructively discharged under Title VII.  Although plaintiffs mention that their working conditions were poor, they have not asserted or pled a hostile work environment claim, which presents a lower burden than the burden of proving a constructive discharge claim under Title VII.  Accordingly, Ms. Modoc and Ms. Cowger's claims under Title VII should be dismissed.

Plaintiffs have not met their summary judgment burden to show that Ms. Modoc and Ms. Cowger were constructively discharged under Washington law because plaintiffs do not assert that Ms. Modoc and Ms. Cowger's constructive discharges contravened a recognized public

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 17

1    policy.  Accordingly, Ms. Modoc and Ms. Cowger's claims under the WLAD should be

2    dismissed.  Because Ms. Modoc and Ms. Cowger's Title VII and WLAD claims fail, their claims

3    under 42 U.S.C. § 1981 should be dismissed.

4          **2.  Tori Stevens and Frank Walker**

5          The complaint alleges that defendants discriminated against Ms. Stevens and Mr. Walker,

6    in violation of Title VII and the WLAD; discriminated against Ms. Stevens and Mr. Walker, in

7    violation of 42 U.S.C. § 1981; and wrongfully discharged Ms. Stevens and Mr. Walker.

8          Defendants contend that Ms. Stevens and Mr. Walkers' Title VII and WLAD claims

9    should be dismissed because they were replaced by individuals within the same protected class;

10   they were terminated for legitimate business reasons; and they cannot establish pretext.

11   Defendants further argue that Mr. Walker cannot state a claim under the WLAD because he has

12   not shown that he engaged in any protected activity or that there was any causal connection

13   between a protected activity and his termination.  Additionally, defendants maintain that,

14   because there is no claim under Title VII or the WLAD, Ms. Stevens and Mr. Walkers' claims

15   under 42 U.S.C. § 1981 should be dismissed.

16         Plaintiffs argue that Mr. Walker's WLAD claim is valid because he engaged in the

17   protected activity of opposing WCV's firing practices; because he was fired only days after

18   opposing those practices; and because a causal connection can be inferred from the shifting

19   reasons that WCV provided for terminating Mr. Walker (see page 7 of this order).  Additionally,

20   plaintiffs contend that under the *McDonnell Douglas* standard, Ms. Stevens and Mr. Walker are

21   only required to show that the defendants attempted to fill their open positions with an applicant

22   outside of their protected class.  Plaintiffs argue that the fact that the defendants were unable to

23   fill the positions with members outside of the protected class is irrelevant.  In the alternative to a

24

1   showing under the *McDonnell Douglas* standard, plaintiffs argue that Ms. Stevens and Mr.

2   Walker have shown direct and circumstantial evidence of discriminatory intent.  Plaintiffs further

3   contend that Ms. Stevens and Mr. Walker have provided sufficient evidence that defendants'

4   "legitimate, nondiscriminatory" reasons for terminating Ms. Stevens and Mr. Walker were a

5   pretext for discrimination.

6         As to Mr. Walker's WLAD claim, the temporal proximity between Mr. Walker opposing

7   WCV's firing practices and his termination is sufficient to show a causal connection in support

8   of his WLAD claim.

9         As to Ms. Stevens and Mr. Walker's Title VII and WLAD claims, plaintiffs cite several

10  cases in support of their contention that, under the *McDonnell Douglas* standard, the defendants

11  must only have attempted to fill the plaintiffs' open positions with an applicant outside of their

12  protected class.  These cases were not on point.  *See O'Connor v. Consolidated Coin Caterers*

13  *Corp.*, 517 U.S. 308 (1996) (addressing the *McDonnell Douglas* standard under the Age

14  Discrimination Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*); *Grimwood v. University of Puget*

15  *Sound, Inc.*, 110 Wn.2d 355 (1988) (addressing the *McDonnell Douglas* standard under the

16  ADEA); *Lowe v. City of Monrovia*, 775 F.2d 998 (9th Cir.1985), *amended* 784 F.2d 1407 (9th

17  Cir. 1986) (addressing the *McDonnell Douglas* standard in the hiring context).  However, in the

18  unpublished case *Andebrhan v. Diamond Parking, Inc.*, 2000 WL 1144881 (Wn. App. Div. 1),

19  the Court of Appeals of Washington, Division 1, held that "the *prima facie* element of

20  replacement by a person outside of the protected class 'is not absolute.'"  *Andebrhan*, 2000 WL

21  1144881 * 6 (citing *Grimwood*, 110 Wn.2d 355 at 363 (1988)).  The court in *Andebrhan* held

22  that an employee bringing a wrongful termination claim based on discrimination must only show

23  that the employer sought a replacement with qualifications similar to the employee's own, thus

24

1   demonstrating a continued need for the same services and skills. *Id.* at * 6 (internal citations

2   omitted).  The fact that the employer did not succeed in its goal to hire outside of the employee's

3   protected class was not necessarily fatal, so long as a jury could find that the employer tried to do

4   so. *Id.*

5        Therefore, at this stage, the plaintiffs have made a sufficient showing that the defendants

6   attempted to replace both Ms. Stevens and Mr. Walker with applicants outside of their protected

7   class.  Plaintiffs have asserted that defendants made frequent comments showing that they

8   desired a whiter workforce.  The fact that Mr. Walker was ultimately replaced by a Pacific

9   Islander, and that Ms. Stevens by ultimately replaced by an African American, is not fatal to

10  their claims at the summary judgment stage.

11       Plaintiffs have also met their burden in asserting that the defendants' "legitimate,

12  nondiscriminatory" reasons for terminating Ms. Stevens and Mr. Walker were pretext for

13  discrimination.  Defendants assert that they terminated Ms. Stevens for keeping a customer on

14  hold for too long; however, Ms. Stevens has asserted that she was not trained as to putting

15  customers on hold and was otherwise a top performer.  Defendants assert that they terminated

16  Mr. Walker because of his personal relationship with Ms. Modoc; however, Mr. Walker has

17  asserted that he was given several contradictory reasons for his termination, suggesting that there

18  are questions as to whether he was terminated due to his race.  Accordingly, Ms. Stevens and Mr.

19  Walkers' claims should not be dismissed.

20       **3.  Tony Lambert**

21       The complaint alleges that defendants discriminated against Mr. Lambert, in violation of

22  the WLAD; discriminated against him, in violation of 42 U.S.C. § 1981; and wrongfully

23  discharged him.

24

1   Defendants contend that Mr. Lambert and Mr. Walker cannot show a causal connection

2   between his alleged protected activity and his termination; and cannot demonstrate that the

3   reason for terminating him was pretextual.  Defendants maintain that, because there is no claim

4   under Title VII or the WLAD, Mr. Lambert's claim under 42 U.S.C. § 1981 should be dismissed.

5   Plaintiffs argue that Mr. Lambert can show a causal connection between his protected

6   activity and his adverse employment action through the temporal proximity of the events.  Mr.

7   Lambert asserts that he was fired ten days after refusing to follow the defendants' discriminatory

8   firing practices.  This temporal proximity is sufficient to show a causal connection.

9   Plaintiffs have also met their burden in asserting that the defendants' "legitimate,

10  nondiscriminatory" reasons for terminating Mr. Lambert were pretext for discrimination.

11  Defendants argue that Mr. Lambert was terminated due to his discriminatory and unprofessional

12  conduct toward employees; however, Mr. Lambert has assert that such accusations against him

13  were questionable.

14  **4.   Wrongful Discharge Claims of all Plaintiffs**

15  The complaint alleges that all plaintiffs were wrongfully discharged.  Defendants contend

16  that the plaintiffs' wrongful discharge claims are precluded as a matter of law because they are

17  within the scope of the WLAD.  Plaintiffs argue that they have asserted a *prima facie* case for

18  wrongful discharge and that their claims are not precluded by the WLAD.

19  A claim of wrongful discharge in retaliation for opposing discrimination falls within the

20  scope and elements of such a claim under the WLAD.  *Cooper*, 2007 WL 3356809.  Therefore,

21  the WLAD precludes the wrongful discharge claims based on the retaliation claims of Ms.

22  Modoc, Ms. Cowger, Mr. Walker, and Mr. Lambert.

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 21

1      Although there is no authority directly on point, it appears that a claim of wrongful

2   discharge due to racial discrimination also falls within the scope and elements of such a claim

3   under the WLAD.  Therefore, the WLAD precludes the wrongful discharge claims based on the

4   racial discrimination claims of Mr. Walker and Ms. Stevens.  Accordingly, the plaintiffs'

5   wrongful discharge claims should be dismissed.

6      Therefore, Defendants' Motion for Summary Judgment (Dkt. 30) is GRANTED in part

7   and DENIED in part, as follows: Defendants' Motion for Summary Judgment is DENIED as to

8   the claims of Ms. Stevens, Mr. Walker, and Mr. Lambert and the claims of these plaintiffs, with

9   the exception of the claims for wrongful discharge, may proceed. Defendants' Motion for

10   Summary Judgment is GRANTED as to the claims of Ms. Modoc and Ms. Cowger and as to all

11   plaintiffs' claims for wrongful discharge, and these claims are DISMISSED WITH PREJUDICE

12      The Clerk is directed to send uncertified copies of this Order to all counsel of record and

13   to any party appearing *pro se* at said party's last known address.

14      Dated this 11th day of April, 2011.

15

16

17   ROBERT J. BRYAN
    United States District Judge

18

19

20

21

22

23

24